Robert VANOVER, Plaintiff,

v.

Alan HANTMAN, Office of the Architect of the Capitol; Patrick Taylor, Chef, Senate Restaurants, Office of the Architect of the Capitol; Carl Smith; Lynne Theiss, Executive Officer, Office of the Architect of the Capitol; Robert Miley, Superintendent, House Office Buildings, Office of the Architect of the Capitol; Charles Tyler, General Counsel, Office of the Architect of the Capitol; Peggy Lambert Tyler, Office of Chief Employment Counsel, Office of the Architect of the Capitol; Kevin Mulshine, Chief Employment Counsel, Office of the Architect of the Capitol; and Hector Suarez, Director of the Human Resources Management Division, Defendants.

Civil Action No. 97-2572(TAF).

United States District Court, District of Columbia.

Nov. 19, 1999.

Jeffrey Howard Leib, Washington, DC, for Robert Vanover.

Halsey B. Frank, Michael C. Johnson, U.S. Attorney's Office, Washington, DC, for Alan Hantman.

Michael C. Johnson, U.S. Attorney's Office, Washington, DC, for Charles Tyler, Peggy Lambert Tyler, Kevin Mulshine, Hector Suarez, Patrick Taylor, Lynne Theiss, Robert Miley.

## MEMORANDUM–OPINION

FLANNERY, District Judge.

### I. Introduction

On September 27, 1997, plaintiff was discharged from his employment by order of defendant Alan Hantman, the Architect of the Capitol ("Hantman" or "AC"). He now claims, *inter alia*, that the discharge deprived him of property without due process of law in violation of the Fifth Amendment to the U.S. Constitution, U.S. Const. Amend. V, as well as the provisions of the Architect of the Capitol Human Resources Act (hereinafter "HRA"), 40 U.S.C. § 166b–7 (West Supp.1999), Chapter 752 of the AC Personnel Manual, and the procedural mandates of 5 U.S.C. §§ 7501 et seq. (1994), alleged to be incorporated by reference into the AC's personnel procedures. He also claims that the defendants tortiously interfered with his employment in violation of the law of the District of Columbia.[1] In addition to Hantman, plaintiff sues eight present and former co-employees who were involved in some fashion in his termination proceeding. Each is sued solely in his or her individual capacity. Plaintiff seeks damages, as well as reinstatement and declaratory relief.

Pending before the Court are two motions by the defendants. The first is a motion to substitute the United States as defendant to plaintiff's tort claim pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671 et seq. (1994). Defendants also move to dismiss the tort and due process claims pursuant to Fed.

---

1. Plaintiff has also brought disability discrimination and retaliation claims pursuant to the Congressional Accountability Act ("CAA"), 2 U.S.C. § 1301 et seq. (1994) (making various statutes, including the Americans with Disabilities Act, applicable to Congress). These claims are not relevant to the motions pending before the Court.

R.Civ.P. 12(b)(1) and 12(b)(6). For the reasons discussed below, the motion to substitute is granted in part and denied in part and the motion to dismiss the tort and due process claims is granted.

## II. Background

The facts are taken from plaintiff's allegations in his Amended Complaint and documents referenced therein. Only the facts relevant to plaintiff's tort and due process claims are mentioned.

From January 22, 1992 to September 27, 1997, plaintiff was employed as a custodial cleaner in the United States Senate Restaurants. The Senate Restaurants are under the administration of the Office of the Architect of the Capitol ("OAC"), *see* 2 U.S.C. § 1301(5) (1994), which is also responsible generally for the care and management of Capitol buildings and grounds. 40 U.S.C. § 163 (1982). Defendant Patrick Taylor ("Taylor") is the Chef of the Senate Restaurant and plaintiff's "first-line" supervisor. The "first-line" supervisor is apparently the one who supervises an employee most directly. Defendant Carl Smith ("Smith") is plaintiff's second-line supervisor. Defendant Lynne Theiss ("Theiss") was previously the Director of the Senate Restaurants and plaintiff's third-line supervisor.

Between 1994 and 1996, plaintiff was subjected to a series of disciplinary actions which culminated in the termination of his employment. The first alleged disciplinary action occurred on September 21, 1994, when Smith gave plaintiff a warning "to take immediate action to correct ... work habits which, in some instances, were creating serious accident hazards to other members of the kitchen staff." Am.

Compl. ¶ 43. On September 13, 1995, Smith issued plaintiff a "Proposal of Official Reprimand" for "failure" on August 8, 1995 "to perform assigned duties in a safe and satisfactory manner, and for unacceptable conduct and behavior, in violation of the ethical conduct standards contained in Section 5.1 of the 'Standards of Conduct of the Architect of the Capitol.'" Am.Compl. ¶ 44. On November 6, 1995, Smith instituted another "Official Reprimand" "for ... failure to perform assigned duties in a safe and satisfactory manner, and for unacceptable conduct and behavior." Am. Compl. ¶ 45. On April 24, 1996, Taylor issued a "Proposal to Suspend" based on plaintiff's "failure to perform. assigned duties in a safe and satisfactory manner; and unacceptable conduct and behavior." Am.Compl. ¶ 46. On July 19 and 22, 1996, respectively, defendant Theiss and plaintiff executed an Alternate Discipline Agreement providing for a "paper suspension."

On or around November 7, 1996, Taylor recommended in an internal memorandum that plaintiff's employment be terminated for continuing performance problems. On January 23, 1997, Smith issued a "Proposal to Terminate" plaintiff's employment based on a number of incidents which Taylor had noted in a private log he had maintained since July 23, 1996. The letter was sent to plaintiff as notice of the proposed action. Pl.App.M.

On February 28, 1997, Theiss issued a letter concurring with the proposed action (again sent to plaintiff) and the action was referred to a hearing officer, defendant Robert Miley ("Miley"), for a formal hearing.[2] Pl.App.N. On July 1, 1997, the hearing was conducted. John Clifford, a private attorney, represented the OAC.

2. The procedures governing disciplinary proceedings are established in Chapter 752 of the OAC's Personnel Manual, as amended on July 14, 1994. *See* Pl.App.D. Chapter 752 provides that, following the issuance of letters proposing the action and concurring in the proposal, the matter is submitted to a hearing officer, who must make findings of fact and a recommendation as to whether the proposed action should be taken. Upon request, the employee is entitled to a formal hearing before the hearing officer before the officer issues findings and recommendations. The employee also has a right to "appeal" the recommendation to the Architect of the Capitol (by filing objections). The AC then issues a final decision letter. There is no administrative appeal from the AC's decision.

Plaintiff was also represented by counsel. By the end of the day, Clifford had presented his evidence, which consisted largely of testimony from Taylor, relying heavily on his log. After Clifford gave his oral summation, plaintiff's counsel was directed to present his "summation" by written document.

Following receipt of plaintiff's written summation, Miley made inquiries to defendant Kevin Mulshine ("Mulshine"), the Chief Employment Counsel, apparently regarding how to address the issues plaintiff had raised in his summation. Mulshine responded in a letter dated July 28, 1997, instructing Miley, in part, that

> a hearing officer's responsibility is to address whether the proposed termination is supported by the information produced at the hearing. The rule of common sense prevails; rules of evidence and burdens of proof that must be followed by a judicial body do not restrict the hearing officer's conduct.

Pl. Appendix O; Am.Compl. ¶ 99. Subsequently, Miley issued findings of fact and a recommendation that the plaintiff be discharged.[3] By letter dated September 18, 1997, Hantman adopted Miley's recommendation and directed that plaintiff's employment be terminated effective September 27, 1997.

### III. Analysis

### A. Motion to Substitute United States As Defendant In Tort Claim

In connection with plaintiff's sixth claim, alleging tortious interference with employment in violation of Section 921 of Title 11 of the District of Columbia Code, defendants have moved pursuant to 28 U.S.C. § 2679 (1994), a provision of the FTCA, to have the United States substituted in the place of the eight defendants sued in their individual capacities, arguing that such substitution is mandatory because defendants were acting within the scope of their employment. Defendants do not move for

---

**3.** Plaintiff provides a copy of Miley's findings of fact and recommendation at Pl.App.P. It is not clear that this version is the final version, as it contains handwritten edits, and is not entirely identical to the findings as quoted later by Hantman in his final termination letter. Pl.App.Q. However, taking the version at Appendix P as accurate, it reads as follows:

Based on the testimony and exhibits at the hearing, I have concluded the following:

1. Mr. Vanover received an Official Reprimand on November 6, 1995 for failure to perform assigned duties in a safe and satisfactory manner, and for unacceptable conduct and behavior. On April 24, 1996, Mr. Vanover received a proposal for his suspension for 10 days for failure to perform assigned duties in a safe and satisfactory manner, and unacceptable conduct and behavior. This proposal to suspend was changed on July 19, 1996 to an "Alternate Discipline Program" wherein Mr. Vanover agreed, among other things, to conduct himself while in the workplace, in a manner which complies with the AoC Code of Conduct. The recommendation for termination of Mr. Vanover complies with the progressive disciplinary actions and "Typical Penalties for Infractions" as described in the AoC Personnel Manual, Chapter 752—Discipline.

2. There were numerous occasions between July 23, 1996 and November 6, 1996 when Mr. Vanover's conduct, while in the employ of the U.S. Senate Restaurants, was in violation of the AoC Standards of Conduct and the AoC policy regarding Violence in the Work Place.

3. Mr. Vanover has sought and received counseling from the AoC Employee Assistance Office and the EEO/FEP Office, as well as having received counseling from his supervisors on numerous occasions. These efforts have been unsuccessful in changing Mr. Vanover's work habits, his argumentative manners and his overall [lack of] concern for safety in the workplace. All attempts to motivate Mr. Vanover to conform to standard work practices such as working in a safe manner and following supervisor's instructions have failed. The EAP and EEO/FEP Office have provided assistance to an Mr. Vanover [sic], however, this did not effect a change in Mr. Vanover's work habits. In the best interest of maintaining a safe and efficient work place in the U.S. Senate Restaurants, I recommend that Mr. Robert Vanover be terminated from his position as Kitchen Custodial Cleaner.

Pl.App.P.

substitution of Hantman, who is sued only in his official capacity.

■ The FTCA provides a general waiver to the United States' sovereign immunity to tort liability, with certain specified exceptions. 28 U.S.C. § 2680 (1994) (listing exceptions). In 1988, Congress amended the FTCA with passage of the Federal Employees Liability Reform and Tort Compensation Act ("Liability Reform Act"). As amended by the Liability Reform Act, section 2679 of the FTCA provides that an action against the United States is the exclusive remedy for any damages claim arising out of the "negligent or wrongful act[s] or omission[s]" of federal employees done while acting within the scope of their employment. 28 U.S.C. § 2679(b)(1) (1994). Section 2679 thus gives federal employees absolute immunity from tort liability for acts done in the scope of their employment. *Simpkins v. Shalala,* 999 F.Supp. 106, 119 (D.D.C. 1998).

■ Section 2679 also provides a specific procedure to implement its immunity mandate. When a federal employee is sued in tort, the Attorney General must certify whether the employee was acting within the scope of his or her employment at the time of the allegedly tortious act. 28 U.S.C. § 2679(d)(1). Upon certification, the United States is substituted as the sole defendant and any tort claim against the individual arising out of the same "subject matter" is precluded. *Id.*[4] Substitution of the United States is mandatory even if the tort claim is one of those for which the government has not waived its sovereign immunity. *See U.S. v. Smith,* 499 U.S. 160, 165, 111 S.Ct. 1180, 113 L.Ed.2d 134 (1991).

■ It is established that a tortious interference with employment claim falls within the broad set of state law tort claims subject to the substitution provision of the FTCA. *See Simpkins,* 999 F.Supp. at 119 (applying substitution to claim for interference with contractual, economic, and business relations); *Claasen v. Brown,* No. Civ. A. 94–1018, 1996 WL 79490 (D.D.C. Feb.16, 1996) (applying substitution to claim for interference with employment contract); *Aviles v. Lutz,* 887 F.2d 1046, 1048 (10th Cir.1989) (applying § 2679 to claim for tortious interference with employment rights). Thus, the claim is subject to substitution where employees have been certified to be acting in the scope of their employment.

■ The Attorney General, pursuant to 28 U.S.C. § 510 (1994), has delegated certification authority to the United States Attorneys. 28 C.F.R. § 15.3. In this case, the U.S. Attorney has certified that the defendants sued in their individual capacity were acting within the scope of their employment at the time of the alleged incidents. The statutory requirements for substitution are therefore satisfied.

Nevertheless, defendants' motion must be denied in part. Although substitution is appropriate insofar as plaintiff's claim seeks damages, it is inappropriate insofar as plaintiff's claim seeks injunctive or declaratory relief. Section 2679(b)(1) specifies what sort of claims may not be brought against individual employees, and states in relevant part that

[t]he remedy against the United States ... is exclusive of any other civil action or proceeding *for money damages* by reason of the same subject matter against the employee whose act or omission gave rise to the claim or against the estate of such employee. Any other civil

---

4. Section 2679(d)(1) states, in full:

Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.
28 U.S.C. § 2679(d)(1) (1994).

action or proceeding *for money damages* arising out of or relating to the same subject matter against the employee or the employee's estate is precluded without regard to when the act or omission occurred.

28 U.S.C. § 2679(b)(1) (1994) (emphasis added). This language, providing for preclusion of actions "for money damages" logically implies that an action for injunctive or declaratory relief would not be precluded. It is true that the substitution provision, § 2679(d)(1), does not itself contain this limiting language. It only refers to substitution for any action arising out of "the claim." 28 U.S.C. § 2679(d)(1). However, "the claim" is best understood in reference to the limiting language in the earlier provision. *But see Simpkins v. Shalala*, 999 F.Supp. at 119 (holding that, even where plaintiff sought injunctive and declaratory relief, "[a] plaintiff's sole remedy for action taken by employees acting within the scope of their duties is against the government, even if the government would not be liable due to sovereign immunity."). Accordingly, defendants' motion to substitute is granted as to the claim for damages and denied as to the injunctive and declaratory relief.

### C. Motion To Dismiss—Standard of Review

Dismissal pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim is proper only when it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief. *See Tele–Communications of Key West, Inc. v. U.S.*, 757 F.2d 1330, 1334 (D.C.Cir.1985). The court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff. *See Antonelli v. Sheahan*, 81 F.3d 1422, 1427 (7th Cir.1996). A motion to dismiss to dismiss for lack of jurisdiction pursuant to Rule 12(b)(1) is reviewed under a similar standard, where the motion challenges the sufficiency of the allegations of subject matter jurisdiction. *See Pitney Bowes Inc. v. U.S. Postal Service*, 27 F.Supp.2d 15, 19

(D.D.C.1998). The burden of proving jurisdiction is upon the plaintiff. *Id.*

When reviewing a motion under Fed.R.Civ.P. 12(b)(6), if "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56. . . ." Fed.R.Civ.P. 12(b). However, where a document is referred to in the complaint and is central to plaintiff's claim, such a document attached to the motion papers may be considered without converting the motion to one for summary judgment. *Greenberg v. The Life Insurance Company of Va.*, 177 F.3d 507, 514 (6th Cir.1999). The Court finds that Chapter 752 of the Personnel Manual and the various letters and materials produced in the course of plaintiff's discharge proceeding, all of which have been attached to plaintiff's opposition papers, fall under this exception and may be considered without converting the motion to one for summary judgment.

### D. Motion to Dismiss the Tort Claim

Defendants move for the dismissal of the tort claim, arguing that the claim may not proceed against the United States because it falls under an exception to the FTCA's waiver of sovereign immunity. Among the exceptions to the general waiver is one for "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or *interference with contract rights* . . . ." 28 U.S.C. § 2680(h) (1994) (emphasis added). This has previously been interpreted as encompassing claims for interference with employment. *See U.S. Information Agency v. Krc*, 989 F.2d 1211, 1216 (D.C.Cir.) (holding that where plaintiff brought a claim for tortious interference with prospective employment, "a claim for monetary damages would clearly be barred by sovereign immunity" because of the § 2680(h) exception), *reh'g denied*, 998 F.2d 1040 (1993), *cert. denied, Krc v.*

*U.S. Information Agency,* 510 U.S. 1109, 114 S.Ct. 1049, 127 L.Ed.2d 371 (1994). Plaintiff's claim against the United States for damages thus falls outside the FTCA's waiver of immunity, and must be dismissed.

■ The action for damages against Hantman in his official capacity must be dismissed for the same reason. It is well-established that sovereign immunity applies to suits for money damages against officials in their official capacity absent a specific waiver by the government. *See Clark v. Library of Congress,* 750 F.2d 89, 103 (D.C.Cir.1984). Since the FTCA's waiver is inapplicable, the action for damages against Hantman, like the action against the United States, is barred.

■ Turning to the claim insofar as it seeks injunctive relief, specifically reinstatement, the Court finds that dismissal is again appropriate. Courts have held that an award of injunctive relief, particularly where it seeks official action such as reinstatement, cannot be imposed on officials in their individual capacities. *See Frank v. Relin,* 1 F.3d 1317, 1327 (2d Cir.) ("[S]uch equitable relief [i.e. reinstatement] could be obtained against Relin only in his official, not his individual capacity ...."), *cert. denied, Relin v. Frank,* 510 U.S. 1012, 114 S.Ct. 604, 126 L.Ed.2d 569 (1993); *Hill v. Shelander,* 924 F.2d 1370, 1374 (7th Cir. 1991) ("[I]njunctive relief may only be recovered from public officials acting in their official capacities"); *Scott v. Flowers,* 910 F.2d 201, 213 (5th Cir.1990) ("[T]he injunctive relief sought and won ... can be obtained from the defendants only in their official capacity as commissioners"); *Rao v. New York City Health and Hospitals Corp.,* 882 F.Supp. 321, 330 (S.D.N.Y.1995) ("Those courts that have specifically considered the issue of reinstatement have found reinstatement to be appropriate only where, unlike the situation here, an individual defendant is liable in his official capacity—where, in other words, the liability is against the government entity"). The claim against the individual defendants must therefore be dismissed.

■ As against Hantman, who is sued in his official capacity, the claim for injunctive relief is again subject to the sovereign immunity of the United States and its officers unless such immunity is waived by the Administrative Procedures Act ("APA"). *See Cobell v. Babbitt,* 30 F.Supp.2d 24, 31 (D.D.C.1998) ("[I]ssues of sovereign immunity in the context of injunctive relief against federal officers of the United States must be resolved with reference to [the APA].") The APA waives the immunity of United States agencies and officers to actions for relief other than damages. 5 U.S.C. § 702.[5] *See also Clark v. Library of Congress,* 750 F.2d 89, 102 (D.C.Cir.1984) ("With respect to claims for non-monetary relief, the 1976 amendments to § 702 of the [APA] ... eliminated the sovereign immunity defense in virtually all actions for non-monetary relief against a U.S. agency or officer acting in an official capacity.") (citations omitted). Further, this waiver of immunity extends beyond actions brought under the APA. *See Cobell,* 30 F.Supp.2d at 31. However, the waiver is limited by its own terms to claims against an "agency or an officer or employee thereof." 5 U.S.C. § 702. "Agency" is defined in 5 U.S.C. § 701 (1994) as "each authority of the Government of the United States," but with a number of specified exceptions, among them "the Congress." *Id.,* § 701(b)(1)(A).

---

**5.** Section 702 states in relevant part:

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702.

The D.C. Circuit has "interpreted the APA exemption for 'the Congress' to mean the entire legislative branch." *Washington Legal Foundation v. U.S. Sentencing Commission,* 17 F.3d 1446, 1449 (D.C.Cir. 1994). "Thus, [they] have held that the Library of Congress (part of the legislative branch but a separate entity from 'the Congress,' narrowly defined) is exempt from the APA because its provisions do not apply to 'the Congress'—that is, the legislative branch." *Id.*

Like the Library of Congress, the Architect of the Capitol is considered part of the legislative branch. *See, e.g.,* 2 U.S.C. § 60–1 (1994) (AC defined as "officer of the Congress"); 2 U.S.C. §§ 1302, 1301(5) (1994) (making eleven statutes applicable to "the legislative branch," including, *inter alia,* the Office of the Architect of the Capitol); 5 U.S.C. § 2107(7) (1994) (stating that "Congressional employee" means, *inter alia,* "the Architect of the Capitol and an employee of the Architect of the Capitol"). Thus, the APA's waiver is inapplicable and the claim for injunctive relief against Hantman must be dismissed. *See Clark,* 750 F.2d at 102 (holding APA waiver of immunity inapplicable to Library of Congress).

■ Turning finally to the claim for declaratory relief, it is clear that this too must be dismissed for the same reasons as applied to the injunctive relief. *See Dertz v. City of Chicago,* 912 F.Supp. 319, 328 (N.D.Ill.1995) (noting that both injunctive and declaratory relief must be sought against officials in their official capacity), *on reconsideration in part,* 1997 WL 85169 (N.D.Ill. Feb. 24, 1997). Further, a declaratory judgment is appropriate to declare the rights between the parties only where there is "a very significant possibility of future harm; it is insufficient ... to demonstrate only a past injury." *San Diego County Gun Rights Committee v. Reno,* 98 F.3d 1121, 1126 (9th Cir.1996). *See also Chagnon v. Bell,* 468 F.Supp. 927, 933 (D.D.C.1979) (holding that declaratory judgment is appropriate if challenged gov-ernment activity is "continuing" and "casts what may well be a substantial adverse effect upon the interests of the petitioning parties.") (citation and internal quotations omitted), *aff'd,* 642 F.2d 1248 (D.C.Cir. 1980), *cert. denied,* 453 U.S. 911, 101 S.Ct. 3142, 69 L.Ed.2d 994 (1981). Here, plaintiff seeks only a declaration that he has suffered a past injury. The very nature of the remedy requested is therefore improper.

■ Moreover, a claim for a declaratory judgment should be dismissed where "the remedy sought is a mere declaration of law without implications for practical enforcement upon the parties...." *S. Jackson & Son, Inc. v. Coffee, Sugar & Cocoa Exchange, Inc.,* 24 F.3d 427, 431 (2d Cir.1994) (citation and internal quotations omitted). Here, no practical enforcement is available since damages and prospective relief are both barred for the reasons discussed above. Therefore, even if the nature of the declaration were proper, this Court would still find dismissal appropriate.

In sum, plaintiff's tort claim is dismissed in its entirety.

*E. Motion to Dismiss Due Process Claim*

Defendants also move to dismiss the claim asserting that the defendants have deprived plaintiff of a property interest in his employment without due process of law. Defendants argue (1) that the court should not create an implied constitutional claim in this context because Congress has created a comprehensive system of remedies for such claims and that such a system is preclusive under *Bush v. Lucas,* 462 U.S. 367, 368, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983); and (2) that plaintiff's due process claim fails on the merits.

■ The Court finds that the claim does fail on the merits. In order to establish a deprivation of property without due process, plaintiff must demonstrate: (1) that he was deprived of a protected prop-

erty interest and (2) that defendants deprived him of that interest without providing the process that was due. *See Orange v. District of Columbia*, 59 F.3d 1267, 1273 (D.C.Cir.1995). Here, the Amended Complaint and referenced documents demonstrate that, while plaintiff had a property interest in his employment, he received all the process that was due. Accordingly, the claim must be dismissed and there is no need to address whether plaintiff's claim is precluded by a comprehensive system of remedies.[6]

### 1. Property Interest

Defendants argue primarily that plaintiff's due process claim must be dismissed because he does not have any property interest in his employment that is protected by due process. The seminal case on this issue is *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). In *Board of Regents*, the court stated that to have a property interest in a benefit, a person "must have more than a unilateral expectation of it." *Id.* at 577, 92 S.Ct. 2701. He must, instead, have "a legitimate claim of entitlement to it" created and defined "by existing rules or understandings that stem

from an independent source such as state law." *Id.* These rules or understandings must provide the person with "an objectively reasonable expectation that he is entitled to retain [his employment.]" *Hall v. Ford*, 856 F.2d 255, 266 (D.C.Cir.1988).

Plaintiff relies primarily on the personnel rules promulgated by the AC pursuant to the statutory mandate of the HRA.[7] Specifically, plaintiff points to Chapter 752 of the Personnel Manual, which establishes procedures and standards for disciplining OAC employees.

Defendants argue that plaintiff is a member of the excepted service under the CSRA, and assert that a member of the excepted service is subject to termination without prior notice, a hearing, or cause. They rely on *Larker v. Allan*, Civ.A. No. 87–2780, 1991 WL 153119 (D.D.C. July 23, 1991), where the court found that because employees of the OAC were members of the excepted service, they did not have a protected property interest in their employment. However, that case was decided before the OAC amended its Personnel Manual in 1994 pursuant to the HRA's mandate. Thus, *Larker* does not address

---

**6.** Even if the Court were to first consider defendants' argument with regard to the preclusive effect of a comprehensive system of remedies and to rule in defendants' favor on that issue, it still would be necessary to reach the merits. Defendants' argument relies on a theory of preclusion established in *Bush v. Lucas*, 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983) and expanded in *Spagnola v. Mathis*, 859 F.2d 223, 226 (D.C.Cir.1988). It is established, however, that under this theory, a constitutional claim is precluded only insofar as it seeks damages. *See Spagnola*, 859 F.2d at 229–30 (holding that, while constitutional claim for damages is barred, "this court has affirmed the right of civil servants to seek equitable relief against their supervisors, and the agency itself, in vindication of their constitutional rights"). Thus, resolving plaintiff's equitable claim would require this Court to reach the merits in any case.

**7.** The HRA, passed in 1994, mandates that "[t]he Architect of the Capitol shall establish and maintain a personnel management sys-

tem." 40 U.S.C. § 166b–7(c)(1). The law also specifies eight requirements that the system must satisfy, *id.*, § 166b–7(c)(2), including "[a] fair and equitable system to address unacceptable conduct and performance by Architect of the Capitol employees, including a general statement of violations, sanctions, and procedures which shall be made known to all employees, and a formal grievance procedure." *Id.*, § 166b–7(c)(2)(F).

The HRA also provides deadlines for the development and implementation of the plan. *Id.*, § 166b–7(d). The provision as originally passed provided for an administrative remedy to certain discrimination and retaliation claims, *id.*, § 166b–7(e) (repealed, Pub.L. 104–1, Jan. 23, 1995, 109 Stat. 41). However, the only measure provided to enforce the personnel system as a whole is a requirement that the AC himself develop a system of oversight and evaluation and that he given an annual report to various entities in Congress on the results of his evaluation. *Id.*

whether the amended version creates a property interest.

 Defendants argue that Chapter 752 of the Personnel Manual cannot create a property interest because the OAC is not an Executive Agency and thus has no legal authority to issue regulations or "administrative law." However, defendants are incorrect in asserting that only formal regulations or statutes can create property interests. It is established that a legitimate expectation of continued employment can be created by both "rules" (statutes or regulations) or "understandings" (express or implied contracts). *See Hall v. Ford*, 856 F.2d 255, 265 (D.C.Cir.1988). Thus, statements in employee handbooks and manuals can create a property interest in continued employment. *See Doe v. Gates*, 981 F.2d 1316, 1320 (D.C.Cir.1993); *see also Ashton v. Civiletti*, 613 F.2d 923, 928 (D.C.Cir.1979) (holding that while FBI employees did not have statutory civil service protections, "those facts do not prevent the Bureau from giving its employees some security in their jobs" and finding that statements in FBI manual established property right). Indeed, in *Larker*, the case on which the defendants rely, the court found that employees of the OAC had no property right only because the OAC "did not make any assurance to its employees ... *through a handbook or manual* ... that they could expect continued employment so long as they performed their jobs satisfactorily." *Larker*, 1991 WL 153119, *4. In implicitly holding that assurances in an OAC manual could establish a property right, *Larker* is itself inconsistent with defendants' position.

 Of course, the language involved must be sufficient to create an "objectively reasonable" expectation that an employee will be terminated only for certain causes. The D.C. Circuit has previously found that an employee who could be dismissed only for "such cause as will promote the efficiency of the service" enjoyed an entitlement to his job. *See Griffith v. Federal Labor Relations Authority*, 842 F.2d 487, 498 (D.C.Cir.1988) (citing *Johnson v. United States*, 628 F.2d 187 (D.C.Cir.1980)). In this case, Chapter 752 states that one of the policies of the OAC is to "[e]nsure that disciplinary actions are taken only for such cause as will promote the efficiency of the Office under fair, orderly, and uniform procedures for effecting actions which are warranted on their merits." Pl.App.D at ¶ 1.2.5. This language, albeit expressed as a policy rather than an expressed rule, is almost identical to that which the D.C. Circuit has previously found to create a property interest.

Further, defendants' assertion that plaintiff could be terminated without cause flies in the face of the entire elaborate disciplinary procedure mandated in Chapter 752. For example, section 1.7 specifies that disciplinary actions should be imposed in a progressively stringent pattern, and provides that a first offense may result in termination only if it involves "serious" problems, specifically including, but not limited to, "those which endanger or threaten Members of Congress or their staffs and other Office employees, involve the possession, sale, or receipt of a controlled substance; theft; and all cases involving weapons." Pl. App.D at Subchapter 1.7. An unrestricted right of termination without cause is clearly inconsistent with this rule.

Further, in numerous places throughout the disciplinary action procedure, defendants are required to specify the existence of a cause for the disciplinary action. *See, e.g.*, Pl.App.D at Appendix B.1.2 (stating that proposing officer "*shall* ... provide ... evidence of the problem(s) or incident(s).... The charge(s) must be supported by warnings previously issued, continued violations on which previous action(s) was taken, or specific evidence if the action is the first disciplinary action proposed."). Defendants' assertion that plaintiff could be fired without cause is again inconsistent with these requirements of evidence and supporting reasons. The Court has no difficulty finding that

the policy and implementing procedures of Chapter 752 gave plaintiff an objectively reasonable expectation that he would be terminated only for cause and that plaintiff thus had a protected property right in his employment.

*2. Whether plaintiff received due process*

Plaintiff asserts that defendants failed to follow their own procedures as established in the Personnel Manual and certain allegedly applicable statutory provisions, and have thus failed to provide "due process." Plaintiff argues that defendants, having promulgated rules that govern how an employee may be discharged, are constitutionally required to follow them. Plaintiff cites *Service v. Dulles*, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957) and *Vitarelli v. Seaton*, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959). These cases in turn rely on the so-called *Accardi* doctrine (based on *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954)), which holds, roughly, that an agency "must adhere to voluntarily adopted, binding policies that limit its discretion." *Padula v. Webster*, 822 F.2d 97, 100 (D.C.Cir.1987); *Wilkinson v. Legal Services Corp.*, 27 F.Supp.2d 32, 47 (D.D.C.1998). As discussed in *Wilkinson*, courts have provided judicial review pursuant to the *Accardi* doctrine of claims that an agency has acted in violation of its own binding procedures where those procedures are promulgated for the protection of individuals, even where the procedures were not issued as formal regulations.

■ However, contrary to plaintiff's assertion, a violation under the *Accardi* doctrine is not always equivalent to a constitutional violation of due process. *Accardi* is based on administrative law principles, not constitutional due process requirements. *See Board of Curators of the University of Missouri v. Horowitz*, 435 U.S. 78, 92 n. 8, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978); *Vitarelli v. Seaton*, 359 U.S. 535, 546–47, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959) (J. Frankfurter, con-

curring) (referring to *Accardi* rule as a "judicially evolved rule of administrative law"). Thus, even where a protected employment interest is at stake, an agency does not violate due process merely because of a failure to follow its own procedures in the discharge proceeding. Rather, for purposes of constitutional review, the procedures taken need only satisfy the minimum required by due process. *See Stone v. F.D.I.C.*, 179 F.3d 1368, 1377 (Fed.Cir.1999) ("the Due Process Clause only provides the minimum process to which a public employee is entitled"); *see also Goodrich v. Newport News School Bd.*, 743 F.2d 225, 227 (4th Cir.1984) ("When the minimal due process requirements of notice and hearing have been met, a claim that an agency's policies or regulations have not been adhered to does not sustain an action for redress of procedural due process violations"); *Atencio v. Bd. of Educ. of Penasco Independent School Dist. No. 4*, 658 F.2d 774, 779 & n. 11, 781 (10th Cir. 1981) (holding that violation by state entity of procedural rights granted in state statute or regulation; did not necessarily violate constitutional due process); *Bates v. Sponberg*, 547 F.2d 325, 329–30 (6th Cir.1976) ("it is only when an agency's disregard of its rules results in a procedure which in itself impinges upon due process rights that a federal court should intervene in the decisional processes of state institutions" and distinguishing *Accardi* as based on "a rule of administrative law"); *Edwards v. Bd. of Regents of Northwest Missouri State University*, 397 F.Supp. 822, 828 (W.D.Mo.1975) (holding that the *Accardi* doctrine "enforced a rule of administrative law that the government must follow duly promulgated regulations that have 'the force and effect of law....' It did not, however, hold that the failure to follow those regulations gives rise to a constitutional claim for the denial of due process.") (citations omitted). Whether the failure to satisfy such procedures violates the *Accardi* doctrine is thus a wholly separate question.

Therefore, after reviewing plaintiff's allegations of procedural error, the Court will first consider whether the alleged errors support a violation of due process and then analyze whether plaintiff has present sufficient evidence to support a claim under the *Accardi* doctrine.

*3. Plaintiff's Claims of Procedural Error*

Plaintiff's allegations of error, essentially, are as follows:

1) Plaintiff alleges that the defendants improperly relied on Taylor's private log of incidents involving plaintiff to support the disciplinary action. Plaintiff also alleges that he was improperly denied opportunity to suppress the log.

2) Plaintiff alleges that the letter proposing termination did not give notice that the action would be based on all the incidents noted in the log.

3) Plaintiff alleges that defendants pursued termination without obtaining the opinion of the General Counsel as required by the Personnel Manual.

4) Plaintiff alleges that the communications following the hearing between Miley and Mulshine were illegal "ex parte" contacts, and that Mulshine's assertion that the rule of "common sense" prevails and that Miley need not follow "rules of evidence and burdens of proof" applicable to a judicial body was an erroneous statement of the applicable procedures. Pl.App.O.

*4. Constitutional Due Process Requirements*

■■■■ Constitutionally adequate process must include notice and "some form of hearing," as the government "may not finally destroy a property interest without first giving the putative owner an opportunity to present his claim of entitlement." *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 434, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982). With regard to a termination of a protected interest in employment, due process requires a notice and a pretermination hearing allowing the employee to challenge the grounds of the termination. *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542–43, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *Ashton,* 613 F.2d at 931. More specifically, "[t]he tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id.* at 546, 105 S.Ct. 1487.

■■■■ Plaintiff asserts in his memorandum that the notice was insufficient because it did not make clear what conduct he was being charged with. The notice, sent by Smith, stated: "I am proposing to terminate your employment for: failure to follow instructions; failure to complete cleaning assignments in a satisfactory manner; failure to perform assigned duties in a safe and satisfactory manner; and responding in an argumentative manner when being counseled." Pl.App.M. As evidence, Smith stated that "Chef Patrick Taylor's log notes for the period July 23, 1996 through November 6, 1996 document incidents occurring on July 23, 30, and 31; August 1, 6, 7, 8, 9, 16, 20, and 22; September 11, 28, and 30; October 8 and 29; and, November 5 and 6." Pl.App.M. Smith then went on to detail specific examples selected from these dates for each category of alleged misconduct. Plaintiff asserts that this was insufficient to warn him that he would be charged with conduct other than the detailed examples.

This Court disagrees. The language quoted would have apprized a reasonable person that the defendants were relying on all the incidents during the period July 23 to November 6, not merely the ones detailed in the notice, as evidence in support of the four general charges. Further, the failure to detail all the entries did not deprive plaintiff of notice of the evidence, since as plaintiff concedes, he had opportunity to view the log itself between January 23, 1997 when the proposal notice was provided and July, 1997 when the hearing was held. Indeed, plaintiff was apprized

of this fact in the proposal letter, which stated:

> You have the right to review the material on which your proposed termination is based. You should telephone Ms. Barbara Willoughby of the Human Resources Management Division at (202) 226–2549 if you wish to make an appointment to review the material.

Pl.App.M. The Court therefore finds that plaintiff received constitutionally adequate notice of the charges and the evidence against him.

 Plaintiff objects to the communications between Miley and Mulshine after the hearing as illegal "ex parte" contacts. Ex parte communications that introduce new and material information as to the reasons for the action or the evidence supporting it violate a person's right to due process. *See Stone v. F.D.I.C.*, 179 F.3d 1368, 1377 (Fed.Cir. 1999). Alternatively, information which undermines the objectivity of the decisionmaker might also constitute a due process violation. *Id.* Here, Miley's initial contact with Mulshine would appear to have been nothing more than an inquiry regarding proper procedure. Any suggestion of other possible content is purely speculative.

Mulshine's letter in response also passes due process review. In the letter, Mulshine stated, in substantial part:

> This is in reference to the [Vanover] case and the arguments put forth by his counsel in a submission to you dated July 15, 1997.
>
> [A]fter the hearing, the role of a hearing officer in these disciplinary proceedings is straightforward—to provide a written report to the Architect that discusses: the merits and the appropriateness of the charges; findings of fact relevant to the alleged offense; and a recommendation on the proposed action. Chapter 752, Appendix C Section .4.2. Thus, a hearing officer's responsibility is to address whether the proposed termination is supported by the information produced at the hearing. The rule of common sense prevails; rules of evidence and burdens of proof that must be followed by a judicial body do not restrict the hearing officer's conduct.
>
> The process therefore does not call upon you to decide the legal issues of the sort that Mr. Vanover's counsel raises in his submission to you. They are for a court or other body of competent jurisdiction to decide, if there is a basis for a statutory or other legal claims against the Office of the Architect and if there is a forum with the requisite jurisdiction.

Pl.App.O. The letter contained no new information as to the nature of the charges or the evidence, but rather dealt with interpretations of the governing procedures. No case law suggests that due process requires a forum to allow every procedural question to be debated. Further, there is nothing in Mulshine's letter that suggests that Miley's objectivity would be undermined. Rather, the letter reiterates that the hearing officer has a duty to determine the appropriateness of the charges.

Plaintiff's argument that the substance of Mulshine's instructions deprived him of due process must also be rejected. The meaning of Mulshine's instruction regarding "burdens of proof" is somewhat ambiguous. However, it clearly did not mean that the AC had no burden of proof. Rather, the procedure requires that "[t]he Office Representative shall present the Office's case, evidence and the testimony of witnesses approved by the Hearing Officer *to support the charge.*" Pl.App.D, at Appendix C (emphasis added). The Hearing Officer is then required to determine "[t]he merits of the charges presented" and make "[f]indings of fact which address the nature and extent of the offense allegedly committed by the [employee.]" *Id.* The procedures thus reflect that the Hearing Officer must find that the OAC has presented evidence supporting the charge. Mulshine's statement was perfectly consistent with this assertion. He plainly stated that "a hearing officer's responsibility is to

address whether the proposed termination *is supported by the information produced at the hearing.*" Pl.App.O (emphasis added)

██ To the extent that Mulshine's statement indicated that Miley was not required to follow the formalities and procedures attendant in a judicial forum, this did not deprive plaintiff of due process. There is no constitutional requirement that the hearing provided follow all the rules applicable to a judicial proceeding. *See Lew v. Kona Hospital,* 754 F.2d 1420, 1424 (9th Cir.1985) (hearing did not need to "comport with all the requirements of a formal judicial proceeding including pre-trial discovery and strict application of the rules of evidence"). For this same reason, plaintiff's argument that he was deprived of due process because he was not allowed to move for the suppression of the log is without merit. Even assuming the reliance on the log would not meet the standards of the Federal Rules of Evidence, defendants were not required to meet those standards.[8] The Court concludes that the procedures taken to discharge plaintiff fully satisfied constitutional due process.

### 5. *Accardi Review*

██ It is well-established under the *Accardi* doctrine that an agency must comply with its own regulations in effecting the removal of one of its employees. *See Holden v. Finch,* 446 F.2d 1311, 1315 (D.C.Cir.1971); *Fausto v. Gearan,* No. Civ.A. 93–1863, 1997 WL 540809, *11 (D.D.C. Aug.21, 1997); *see also Padula v. Webster,* 822 F.2d at 100 (applying *Accardi* to hiring decision); *Mass. Fair Share v. Law Enforcement Assistance Admin.,* 758 F.2d 708, 711 (D.C.Cir.1985) (holding that

agencies must follow procedures "by which the interests of others are to be regulated"). However, even where a procedural error has occurred, courts will not void the result of the proceeding if the error was harmless (or equivalently, "non-prejudicial"). *Mazaleski v. Treusdell,* 562 F.2d 701, 719 (D.C.Cir.1977); *Shidaker v. Carlin,* 782 F.2d 746, 751 (7th Cir.1986), *vacated on other grounds and remanded, Tisch v. Shidaker,* 481 U.S. 1001, 107 S.Ct. 1621, 95 L.Ed.2d 195, *on remand,* 833 F.2d 627 (7th Cir.1986); *see also Gratehouse v. U.S.,* 206 Ct.Cl. 288, 512 F.2d 1104, 1109–10 (1975) (contrasting "harmless error" with case in which "prejudicial procedural error" was committed). The D.C. Circuit has not clearly stated its understanding of what constitutes a "harmless error," merely opining in dicta that "a procedural error is not made harmless simply because the government employee appears to have had little chance of success on the merits anyway." *Mazaleski,* 562 F.2d at 719 n. 41. However, it appears to be consistent with the view of the Seventh Circuit on this issue:

> We are unconcerned with whether, absent the [procedural error], Koenigs would have reached the same decision to demote Shidakur. The test is not whether the procedural defect caused actual prejudice to the rights of the party before the court. The test is an objective one, whether the particular procedural defect is so substantial and so likely to cause prejudice that no claimant can fairly be required to be subjected to adverse action under such a flawed proceeding.

*Shidaker,* 782 F.2d at 751–52 (citations omitted).[9] *Cf. Waldron v. I.N.S.,* 17 F.3d 511, 518 (2d Cir.1993) (holding that where

---

8. Since Taylor ultimately testified live at the hearing, using the log to refresh his memory, it is not clear that there was any evidentiary problem even under judicial standards. *See* Fed.R.Evid. 803(5) ("recorded recollection" exception to hearsay rule).

9. This understanding of "harmless error" is not universal. For example, the Ninth Circuit has adopted a view that error is harmless if "there is no significant possibility that the violation affected the ultimate outcome of the agency's action." *Carnation Co. v. Secretary of Labor,* 641 F.2d 801, 804 n. 4 (9th Cir. 1981).

regulation does not affect "fundamental rights," violation of the regulation does not render proceeding void unless there is "a showing of prejudice to the rights sought to be protected by the subject regulation"), *cert. denied,* 513 U.S. 1014, 115 S.Ct. 572, 130 L.Ed.2d 489 (1994). The Court therefore proceeds with this test of prejudice in mind.

Defendants do not address whether the OAC's Personnel Manual is enforceable under *Accardi.* However, numerous courts have found that the disciplinary procedures established in a Personnel Manual are the sort of binding procedural rights enforceable under *Accardi,* and that the failure by an employer to follow its own procedures may render a discharge void. *See Larker,* 1991 WL 153119 at *5 (enforcing the Personnel Manual of the OAC); *Fausto,* 1997 WL 540809, *11–13; *see also Mazaleski,* 562 F.2d at 717–18 (enforcing provisions in agency personnel manual). Viewing the Personnel Manual as binding law seems especially appropriate given that the provisions at issue were added to the Manual specifically to comply the statutory mandate of the HRA.

On the other hand, there is also at least some basis to conclude that *Accardi* would not be applicable here. Courts have often relied upon the APA as the source of the *Accardi* doctrine. *See, e.g., Fausto,* 1997 WL 540809, *9. If the *Accardi* doctrine is based upon the right of administrative review found in the APA, then it cannot be applicable to the OAC, which is not subject to the APA's provisions. *See* 5 U.S.C. § 701(b)(1)(A).[10]

The Court need not decide the issue. Assuming that the provisions are enforceable under *Accardi,* the Court finds that plaintiff has not demonstrated that any procedural error occurred. Further, even if defendants committed procedural errors, plaintiff has not demonstrated that he suffered any prejudice.

■ In one respect, plaintiff's *Accardi* claim fails because the procedures alleged to be violated are simply not applicable. Plaintiff argues repeatedly that defendants violated his rights under the procedures established in 5 U.S.C. § 7501 et seq. (1982) and implementing regulations, which he asserts have been "incorporated by reference" into the OAC procedures. These provisions establish procedures for adverse employment actions taken against competitive service employees and certain excepted service employees, but not those in a legislative agency such as the OAC. *See* 5 U.S.C. § 7511(a)(1)(C) (1982).

Plaintiff's assertion that these provisions are incorporated by reference rests on certain adverse employment action documents filled out by OAC employees, in which these sections were cited as legal authority for the actions taken. Defendants argue that this was simply an error on the part of the employees who filled out the forms, and that the actual legal authority for the OAC's personnel actions is 2 U.S.C. § 60–1 (1994). Section 60–1 states, in part, that "each officers [sic] of Congress" shall have authority "to remove or otherwise discipline any employee under his supervision." 2 U.S.C. § 60–1(a)(2) (1994). "Officers of Congress" are defined to include "the Architect of the Capitol." 2 U.S.C. § 60–1(b)(2) (1994).

These provisions clearly provide the AC with authority to engage in personnel actions, and any reference by an OAC employee to 5 U.S.C. § 7501 (1994) as author-

---

**10.** In *Wilkinson,* the court found that the APA was not the root source of *Accardi,* observing that the Supreme Court in *Yellin v. U.S.,* 374 U.S. 109, 83 S.Ct. 1828, 10 L.Ed.2d 778 (1963) applied a sort of *Accardi* rule to a Congressional committee. The Court found that a committee's failure to follow its own rules regarding questioning of witnesses excused a witness from refusal to answer and constituted a defense to a prosecution for contempt. However, *Yellin* may be limited to criminal convictions for procedural violations. It would seem a logical defense to a failure to answer questions, at heart a refusal to submit to process, that the questioners were not submitting to established process themselves.

ity is just as certainly erroneous. More importantly, plaintiff's assertion that these references to 5 U.S.C. § 7501 (1994) reflected an incorporation of the procedural dictates of the provisions is without basis and inherently implausible. The citation was specifically for the purpose of establishing their "legal authority" for the action. Pl.App.E. There is no suggestion that the employees intended this citation to communicate that the provisions were cited *not* as the source of their authority but instead to establish some limited form of incorporation.[11] Beyond these citations, plaintiff has not pointed to any other reference to 5 U.S.C. § 7501 et seq. (1994) in the actual promulgated rules. Indeed, the procedures established in Chapter 752 of the Personnel Manual and in 5 U.S.C. § 7501 et seq. (1994) are completely different, and any suggestion by OAC employees that the latter has been grafted onto the former would be outside their authority. *See Doe v. Gates*, 981 F.2d 1316, 1321 (D.C.Cir.1993) ("when government employees offer assurances that conflict with federal law, they do not speak for the United States"). Since the provisions of 5 U.S.C. § 7501 et seq. (1994) are inapplicable, there is no issue regarding whether they have been violated.

■ With regard to defendants' use of a private log as evidence, plaintiff has not indicated nor has this Court found any rule which bar the defendants from relying on a private log of incidents in proposing or advancing a disciplinary action. Rule 1.1.2 appears to govern what evidence may be relied upon, and provides only: "The first-line supervisor shall, after receiving approval to propose the disciplinary action [from the second-line supervisor], provide the personnel specialist who services the employee's organization with evidence of

the problem(s) or incident(s) and a draft of the charge(s) to be specified in the proposal letter." Pl.App.D at 1.1.2.[12] This rule places no restriction on evidence of the kind described by the plaintiff.

Plaintiff argues that reliance on the log violated Rules 1.12 and 1.13 of Chapter 752. Rule 1.12 (stating in part that there are no mandatory penalties for any problem) seems wholly inapplicable to the question. Rule 1.13 states, in part: "Case files shall contain documentation of all problems which occur and the associated corrective action taken." Pl.App.D at Subchapter 1.13. Plaintiff asserts that this required Taylor to document in the case file all problems as they occurred. However, it is apparent from the requirement to document the "corrective action" that this mandates the documentation of formal disciplinary procedures. It does not mandate that every incident be turned into a formal action, nor does it seem sensible to interpret it in this fashion, since it would require an employer to make every minor incident part of an employee's record regardless of whether it was sufficient in and of itself to warrant any concern.

Although plaintiff appears to feel that keeping a "secret" log deprived him of opportunity to address these complaints, that opportunity was provided by the discharge proceeding itself. Further, although reliance *solely* on these incidents to support a discharge might under other circumstances violate the policy of progressive punishment, here, there were ample formal incidents of lesser punishment relied upon by the defendants. Thus, there is no basis in the rules to believe that the reliance on the log, which ultimately was used at the hearing to refresh

---

11. The provisions could not, of course, be wholly incorporated since by their own terms, they are inapplicable to the OAC.

12. It should be noted that the fact that the proposal and concurrence letters were issued by the second and third-line supervisors, respectively, instead of the first and second, is

not a violation of the Manual's procedures. Although the Manual suggests that the first and second should "normally" be used, Pl. App.D at Appendix B, .1.1, it also allows for the possibility that this will not always be the case.

Taylor's memory of the relevant events, was improper.

Plaintiff's allegation that the General Counsel never gave an opinion implicates Rule 1.14, which states: "The opinion of the General Counsel shall be obtained prior to the issuance of suspension or removal letters in all disciplinary actions...." Pl.App.D at Subchapter 1.14. However, the Court does not agree that defendants violated this rule. The rule does not state that the General Counsel is required to issue a formal, written opinion, and signing off on an action and forwarding it to the next stage of the process could reasonably be understood to also presents an opinion, i.e. that the action should proceed. Here, the General Counsel initialed a disciplinary action routing slip on January 22, 1997. Pl.App.L. A footnote near the initials refers specifically to the requirement that the General Counsel's opinion be obtained. Thus, the inference is plain that by initializing the routing slip, the General Counsel was giving his opinion.

The Court also finds that none of these actions, if they were procedural errors, were "so substantial and so likely to cause prejudice that no claimant can fairly be required to be subjected to adverse action under such a flawed proceeding...." The failure to document the incidents earlier is entirely irrelevant since plaintiff had a full seven months to review the incidents prior to the hearing and full opportunity before the Hearing Officer both to cross-examine Taylor on the incidents and to present his own version of the relevant events. Plaintiff has not even suggested how the failure to obtain a written opinion from the General Counsel made the proceeding unfair. The Court has reviewed the myriad of other minor

allegations of error which plaintiff has made, Pl.Mem. In Opp. at 17–24, and finds that none of them come close to suggesting prejudice under the objective standard.[13] Plaintiff was provided with adequate notice, provided with opportunity to respond to the proposal and the concurring letter, provided with the evidence supporting the action, provided with a full hearing at which he was represented by counsel and had opportunity to confront the witness against him, provided with an opportunity to make a subsequent written argument to the hearing officer, and provided with a final appeal to the AC. As a whole, this process gave plaintiff a fair and more than adequate opportunity to hear the charges against him and present his side of the story.

Accordingly, plaintiff's claim of due process, considered as either a constitutional or *Accardi* claim, must be dismissed.

*IV. Conclusion*

Plaintiff's tort and due process claims are dismissed in their entirety.

---

**13.** It has been stated that "[w]here ... a government employee has no procedural due process rights apart from those which the agency has chosen to create by its own regulations, scrupulous compliance with those regulations is required to avoid any injustice."

Mazaleski, 562 F.2d at 717. Here, plaintiff does have constitutional due process protection, and arguably, defendants should be held to somewhat less scrupulous adherence to the finer points of the Manual.